**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| BRIDGETTE WILLIAMS, | ) | CASE NO: 1:16-CV-1201 |
| on behalf of D.W., | ) | |
| | ) | JUDGE DONALD NUGENT |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Bridgette Williams ("Williams") on behalf of her minor daughter, D.W.,

challenges the final decision of the Acting Commissioner of Social Security, Nancy A. Berryhill

("Commissioner"), denying D.W.'s claim for Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq*. This matter is before the

undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule

72.2(b) for a Report & Recommendation. For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

On March 18, 2013, Williams filed an application for SSI on behalf of her daughter

D.W., a child under the age of eighteen, alleging a disability onset date of January 1, 2006 and

claiming D.W. was disabled due to epilepsy, asthma, learning disability, and attention deficit

hyperactivity disorder ("ADHD"). (Tr. 14, 135, 161.) Williams later amended the onset date to

March 18, 2013.  (Tr. 14, 141.)  The application was denied both initially and upon

reconsideration. (Tr. 14, 89-95, 99-105.)  Williams timely requested an administrative hearing.

(Tr. 106.)

On July 8, 2015, an Administrative Law Judge ("ALJ") held a hearing during which

D.W., represented by counsel, and Williams testified.  (Tr. 38-61.)  On August 6, 2015, the ALJ

found D.W. did not have an impairment or combination of impairments that met, medically

equaled, or functionally equaled the listings.  (Tr. 14-29.)  The ALJ's decision became final when

the Appeals Council denied further review.  (Tr. 1-3.)

## II. Evidence

### *Personal Evidence*

D.W. was born in March 2003, and was a twelve year old "school-age" child when her

application was filed and an adolescent at the time of the hearing,  pursuant to 20 C.F.R. §

416.926a(g)(2).  (Tr. 17.)

### *School Records and Medical Evidence*

In September 2011, D.W. was evaluated by social worker Anthony Martin, LISW-W,

from the Applewood Centers.  (Tr. 354-369.)  D.W. was 8 years old and in 3rd grade at the time.

She was referred for a mental health assessment due to "attention deficit concerns," and

presented with problems of "falling behind in school, unable to maintain concentration with

consistency with games, chores, school– completing school work, reading."  (Tr. 355.)  On

mental status exam, Mr. Martin found D.W. exhibited low average intelligence and significant

difficulty with maintaining focus and concentration.  (Tr. 356, 360.)  He noted D.W.'s

inattention and distractibility compromised her ability to learn and found she "needs

accommodations [and] support to overcome inattention." (Tr. 360.) Mr. Martin also observed

that D.W. fidgeted in her seat and fell asleep in class. (*Id*.) He summarized his findings as

follows:

> Client is 3ʳᵈ grade . . . female who has long history of inattention since
> Kindergarten as observed by schools and parent. She tests as low
> average/borderline in most academic skills, which are further compromised by
> significant inattention problems. She is easily distracted by external noise and
> her own thoughts– drifts off task. She has generalized seizure disorder and has
> been seizure free since 2006. * * * The inattention does not appear to be
> voluntary/willful and occurs at school and home before the age of 7 years old.

(Tr. 368.) Mr. Martin diagnosed ADHD, inattentive type, and assessed a Global Assessment of

Functioning ("GAF") of 62,[1] indicating mild symptoms. (Tr. 365-366.)

The record reflects an Individualized Education Plan ("IEP") and Evaluation Team

Report ("ETR") was completed for the 2011-2012 school year, when D.W. was in third grade.

(Tr. 246-284.) School psychologist Matthew Parks, M.S., completed an assessment of D.W. as

part of this evaluation. He noted D.W.'s first grade teacher indicated she performed "below

expectations" in reading and writing, showed "insufficient progress" in math, and "exceeded

expectations" in science and social studies. (Tr. 251.) D.W.'s final grades for second grade

included a D- in reading; D's in writing, science, and social studies; and an F in math. (*Id*.)

After observing her in the classroom, Mr. Parks found D.W. (1) "was off task and making

---

[1]The GAF scale reports a clinician's assessment of an individual's overall level of
functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more
severe mental impairments. A GAF score between 61 and 70 indicates some mild symptoms or
some difficulty in social, occupational, or school functioning. A recent update of the DSM
eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable
psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders*
(DSM-5) at 16 (American Psychiatric Ass'n, 5ᵗʰ ed., 2013).

comments that appeared to be distracting to other students;" (2) "did not respond appropriately to prompts when off task;" (3) "exhibited significant difficulty maintaining focus during this observation;" (4) "did not exhibit [a] strong work ethic" as evidenced by the fact that she "needed multiple prompts to start classroom activity;" and (5) "struggled significantly with following verbal directions or verbal prompts." (Tr. 252.)

D.W.'s intelligence was evaluated under the Wechsler Intelligence Scale for Children, 4th ed. ("WISC-IV"). (Tr. 253.) Mr. Parks noted D.W. "appeared to give minimal effort and struggled to sustain attention." (*Id.*) She scored a Full Scale IQ of 69; as well as a verbal score of 75, a working memory score of 74, a perceptual reasoning score of 79, and a processing speed score of 68. (*Id.*) As part of this assessment, Mr. Parks noted the observations of D.W.'s second grade teacher, Mrs. Rouse, who indicated D.W. was "unable to retain information in the classroom" and estimated D.W.'s "general intelligence is in the significantly below average range." (*Id.*) Mr. Parks further noted that "[a] Neuropsychological Test Result from a Case Western Reserve University Evaluation dated 2/15/2009 indicated that [D.W.'s] cognitive abilities were measured to be in the Average to Low Average range as measured by the Brief Intellectual Ability Cluster of the Woodcock Johnson III: Tests of Cognitive Abilities." (*Id.*) Mr. Parks summarized his conclusions regarding D.W.'s intellectual functioning as follows:

> Based on [D.W.]'s performance on the WISC-IV, her general intelligence (cognitive abilities) are measured to be in the extremely low range when compared to peers her age. However, observations during this assessment indicated that [D.W.] struggles significantly with sustaining attention and effort for an extended period of time. She appeared to lose focus very easily and when prompted to continue working on activity, [D.W.] would then refuse to respond or say she did not know. Due to these difficulties with behavior, attention, and effort, this is not considered to be the best estimate of her overall intelligence. Her performance in the WJ-III Test of Cognitive Abilities is estimated to be the best estimate of her cognitive abilities (low average range) when compared to

4

peers her age.

(Tr. 253.)

With regard to D.W.'s academic skills, Mr. Parks noted Mrs. Rouse found D.W. performed below grade level in all academic areas; performed extremely low on the Terra Nova test; struggled to complete work in the classroom; failed to complete reading assignments; and made "little growth" in reading skills. (Tr. 255.) It appears Mr. Parks also administered the Woodcock Johnson Test of Achievement, 3rd edition (WJ-III). (*Id*.) On this test, D.W. scored "below average" in listening comprehension and math calculation skills, and in the "low average" range in reading comprehension, written expression, oral expression, and math reasoning. (*Id*.)

In his assessment of D.W.'s social/emotional status and behavior, Mr. Parks noted Mrs. Rouse "reported that [D.W.] does exhibit clinically significant behaviors that are considered Attention Problems, Learning Problems, and Atypical Behaviors," including symptoms of withdrawal and depression in the "at risk" range. (Tr. 261.) Mr. Parks also referenced Williams' report that D.W. "exhibits clinically significant levels of attention problems and at-risk levels of atypical behaviors, and at-risk deficits in functional communication and activities of daily living." (*Id*.) However, Williams also is noted as stating that D.W. likes to read, is a great helper at home, and "understands more than she lets on." (*Id*.) Finally, Mr. Parks noted: (1) Williams "indicated that [D.W.] is involved in a study at Case Western's University Hospitals and has been diagnosed as borderline ADHD;" and (2) D.W. was evaluated by Applewood Centers and "Mr. Martin LISM-S indicated that [D.W.] does meet the criteria of a student with Attention Deficit Hyperactivity Disorder, Inattentive Type." (Tr. 261-262.)

D.W.'s third grade teacher, Kelly Chiappone, completed an assessment regarding D.W. as part of the ETR. (Tr. 259-260.) Ms. Chiappone estimated D.W.'s intelligence to be "significantly below" that of her "typically developing" classroom peers. (Tr. 259.) She offered the following comments:

> [D.W.] is struggling in all academic areas. She doesn't complete class assignments and misses many homework assignments. She currently has a low F in math, reading, and writing.
>
> * * *
>
> [D.W.] is very unorganized. She often forgets directions and struggles processing information. She needs to be redirected and prompted often. She needs to be prompted to get through an assignment.
>
> * * *
>
> [D.W.] sleeps in class. She doesn't pay attention or listen to directions.
>
> * * *
>
> [D.W.] can complete some basic level work with much prompting. She needs someone to walk her through every step of her work.

(Tr. 259-260.)

The ETR concluded D.W. "does need interventions and accommodations that address skills in the areas of listening comprehension and math calculations skills." (Tr. 266.) The ETR team found as follows:

> [D.W.] was previously diagnosed as a student with a Speech/Language Impairment. She has exhibited difficulties with inattention since Kindergarten and has recently been diagnosed with Attention Deficit Hyperactivity Disorder, Inattentive Type by Applewood Centers, Inc. Her inability to focus and her hyperalertness to environmental stimuli does result in a limited alertness to the educational environment and significantly impacting her educational performance. [D.W.]'s 2nd grade teacher and mother indicated clinically significant levels of inattention which are impacting her academic success and her current 3rd grade teacher, Mrs. Chiappone, has reported similar behaviors that are

impacting her in the classroom.  On academic assessments most skills were
measured to be in the average to low average range.  She did exhibit a significant
academic deficit in the area of math calculation.  At this time, [D.W.] does meet
the eligibility criteria under the category of Other Health Impairment and exhibits
a need for specialized instruction.

(Tr. 267.)  It was determined D.W. would benefit from extended time, repeated instructions,

information broken down into small chunks for teaching skills and when completing work,

shortened assignments and testing in small groups for classroom assessments and state/district

wide assessments.  (Tr. 266.)

On April 3, 2013, D.W. presented to neurologist Ajay Gupta, M.D., who had been

treating her for her epilepsy.  (Tr. 320-323.)  D.W. was ten years old and had last visited Mr.

Gupta in April 2012.  (Tr. 320.)  Dr. Gupta noted D.W. had been weaned off Depakote in July

2012 and had been seizure free since February 2006.  (Tr. 320-321.)  She also noted as follows:

[D.W.] has trouble focussing in school.  She is slow to respond.  Her teacher finds
her staring and often looking into space.  She may not socialize in recess with
other kids, however, she is warm affectionate and friendly at school.  She has an
IEP.  This have improved, but inattention and retention remains an issue in
school.  School psychologist thinks she has attention deficit and hyperactivity
disorder. Mother does not want her medicated.

(Tr. 321.)  Dr. Gupta diagnosed (1) generalized epilepsy with no seizures since February 2006;

and (2) "modest developmental delays especially speech and language." (*Id*.)  She noted that the

"[s]chool psychologist thinks [D.W.] has attention deficit and hyperactivity disorder," but stated

"mother does not want her to be medicated unless it is for sure." (*Id*.)  Dr. Gupta concluded

D.W. was "doing well" and found "she does not need to see me further." (*Id*.)

On April 19, 2013, Dr. Gupta completed a "Questionnaire Health Care Professionals on

Medical and Functional Equivalence." (Tr. 324-327.)  Dr. Gupta concluded D.W. had (1)

"marked limitations" in the areas of acquiring and using information, and interacting and relating

with others; (2) "extreme limitations" in the areas of attending and completing tasks, caring for self, and health and physical well-being; and (3) no evidence of limitations in the area of moving about and manipulating objects. (*Id.*) When asked to describe any side effects of prescribed medications, Dr. Gupta wrote "unusual/sudden changes in mood thoughts or behavior including signs of depression." (Tr. 326.) Dr. Gupta further stated D.W. needed special accommodations at school or at home because "she has trouble focusing in school," "she is slow to respond," and "she has an IEP." (*Id.*) Finally, Dr. Gupta noted D.W.'s disorder interferes with her functioning "daily." (*Id.*)

On April 17, 2013, D.W.'s fourth grade teacher, Ms. Davis, completed a "School Activities Questionnaire." (Tr. 167-168.) Ms. Davis stated she had known D.W. since August 2012. (*Id.*) She found D.W. was functioning "below average" in the following areas: (1) attention span and concentration in class; (2) ability to follow instructions; (3) ability to work independently of teacher supervision; (4) ability to understand and complete assignments on time; and (5) ability to progress in learning the skills involved in reading, writing and mathematics. (*Id.*) D.W. had "average" functioning with regard to her abilities to respond to changes in routine and respond to criticism. (*Id.*) Ms. Davis also noted D.W. was "very friendly" and exhibited age-appropriate hygiene and self-care. (*Id.*) She noted D.W. was in special education and a small class setting, and needed extra instruction. (*Id.*) Finally, Ms. Davis stated D.W. "does exhibit some clinically significant difficulties in the area of attention problems at school and at home." (*Id.*)

On May 3, 2013, Williams completed a questionnaire regarding D.W.'s functioning. (Tr. 171-174.) She indicated D.W. was "very nice and overly friendly," and stated D.W. had no

behavior problems at school. (Tr. 171-172.) Williams reported D.W. could only "hold attention for about 10 minutes" and "has to be reminded and sought after to complete tasks and chores." (Tr. 172.) She stated D.W. could read for one hour at a sitting but did not understand and remember what she read. (*Id*.) Williams explained D.W. was "not very good at recalling what she has read. Her attention span is really short." (*Id*.) Williams indicated D.W. helped with household chores such as dishes, and stated she could complete the chores "with help." (Tr. 171.) Finally, Williams stated D.W. needed supervision all day because she "easily loses" her ability to concentrate. (*Id*.)

The record reflects that, in May 2013, an IEP was completed for D.W.'s Fourth-Fifth Grade school year. (Tr. 285-319.) The evaluation noted D.W. "is a friendly student and likes to do well in her class work." (Tr. 286.) It stated that, at that time, D.W. received instruction in a special education resource room for Language Arts and Math, and in a regular education class room for Science and Social Studies. (*Id*.) The IEP contains the following remarks regarding D.W.' s performance in her Language Arts and Math classes:

> [D.W.] is a pleasure to have in Language Arts class. She is a very hard working student. . . . She at times is off-task and a distraction, however with prompting she is easily able to regain focus. On [D.W.'s] previous IEP, she has goals for reading comprehension, reading fluency, and writing. However, looking over her recent performance (including her ETR) and observations, [D.W.] has made progress in these areas. She will no longer have a goal for reading comprehension, reading fluency, and writing. Instead, [D.W.] will have a goal for listening comprehension. In class, she often struggles with following multiple step directions, comprehending a passage after it has been read to her, as well as staying focused and engaged with the lesson.
>
> [D.W.] is also a hard worker in math class. She likes to do well, enjoys working with other students, and is motivated to complete her work. She sometimes gets distracted, but will refocus on her work with minimal verbal prompting. [D.W.] struggles with math calculations and often uses a number line or a multiplication chart to complete her work. * * * [D.W.] takes great pride in her accomplishments

9

and enjoys classroom rewards for her work. [D.W.] sometimes needs directions and lessons repeated for increased understanding, and she will sometimes ask for help when she does not understand her lessons.  On the third grade Ohio Achievement Assessment for the 2011-12 school year, [D.W.] scored Limited.  On the Math Short Cycle Assessment for October 2012, [D.W.] scored Limited.

(Tr. 287.)  D.W.'s IEP continued to implement the accommodation for small group instruction. (Tr. 288, 292.)  However, it stated that, "starting on 8/21/13, [D.W.] will receive Math and Language Arts instruction in the regular education classroom with pullout into the resource room for Language Arts (150 minutes weekly) and Math (150 minutes weekly).  Resource room instruction will be used to reteach concepts to [D.W.] that she struggles with that will not be taught again [in] the regular education classroom."  (Tr. 295.)

On May 17, 2013, D.W.'s teacher, Shannon Davis, completed a "Teacher Questionnaire" for the Social Security Administration ("SSA").  (Tr. 181-190.)  In the domain of "Acquiring and Using Information," Ms. Davis found D.W. had "a serious problem"[2] in the following categories: (1) comprehending and doing math problems; (2) learning new material; and (3) applying problem-solving skills in class discussions.  (Tr. 182.)  She further found D.W. had an "obvious problem" in all remaining areas, including (1) comprehending oral instructions; (2) understanding school and content vocabulary; (3) reading and comprehending written material; (4) understanding and participating in class discussions; (5) providing organized oral explanations and adequate descriptions; (6) expressing ideas in written form; and (7) recalling and applying previously learned material.  (*Id.*)

In the domain of "Attending Completing Tasks," Ms. Davis found D.W. had a "very

_____

[2] According to the "Rating Key" for the Questionnaire, the degree of difficulty a child has in a given category is ranked as follows: No problem -1; A Slight Problem - 2; An Obvious Problem - 3; A Serious Problem -4; and A Very Serious Problem -5. (Tr. 182.)

serious problem" in the following five categories: (1) focusing long enough to finish assigned activity or task; (2) carrying out multi-step instructions; (3) completing class/homework assignments; (4) completing work accurately without careless mistakes; and (5) working at reasonable pace/finishing on time. (Tr. 183.) She determined D.W. had "an obvious problem" in the following areas: (1) paying attention when spoken to directly; (2) sustaining attention during play/sports activities; (3) refocusing to task when necessary; (4) changing from one activity to another without being disruptive. (*Id.*) D.W. had a "slight problem" in working without distracting herself or others, and "no problem" in carrying out single-step instructions, waiting to take turns, and organizing her own things or school materials. (*Id.*) In the Comments section regarding this domain, Ms. Davis noted that "[w]hen given an assignment or test, [D.W.] will stay focused on her work for 10 minutes with 1 or fewer verbal prompts, 3 out of 4 attempts with 75% accuracy."[3] (*Id.*)

Ms. Davis noted that, as of November 2013, D.W. was "progressing" but below average in her reading, math and written language levels. (Tr. 189.) She indicated D.W.'s "score/percentile rank" was 54% in Reading; 20% in Math; and 50% in Written Language. (*Id.*) In conclusion, Ms. Davis stated D.W. "is showing some improvement but still requires a lot of help." (Tr. 188.)

D.W.'s Fourth Grade Report Card indicates she received the following grades during the first, second, and third semesters: (1) a B, C, and B in Reading; (2) a B, B, and B in Written Components; (3) an A, B, and C in Math Components; (4) a C, C, and C in Science; and (5) an

---

[3] Ms. Davis found D.W. had no problems in the domains of interacting and relating with others, moving about and manipulating objects, and caring for herself. (Tr. 184-186.)

F, C, and C in Social Studies.  (Tr. 178-179.)  By the third semester, D.W.'s work habits were all graded as "superior," including in the following areas: (1) completes class work on time, (2) completes work accurately and neatly, (3) works independently, (4) works and interacts well with others, (5) is attentive and follows directions; and (6) displays organizational skills.  (Tr. 179.)

In November 2014, an IEP was completed for D.W.'s Sixth-Seventh Grade school year. (Tr. 384-397.)  The evaluation noted D.W. was "very polite and eager to please," and had a "good attitude towards school." (Tr. 385.)  She reported enjoying walking with friends, playing Wii, and doing board games.  (*Id*.)  The IEP noted D.W. "requires repeated exposure to new skills and concepts when she is not able to focus on a task," but "[w]hen she does focus on a task her ability to learn new skills is improved and at an appropriate rate."  (*Id*.)  It is further indicated that, on her Ohio Achievement Assessment, D.W. scored as "limited" in math and reading and "basic" in science.  (*Id*.)  The IEP stated D.W.  "demonstrates difficulty with listening to and demonstrating comprehension of verbally presented material," and "requires multiple repetitions of verbally presented material in order to correctly paraphrase, identify main idea, or answer inferential questions."  (*Id*.)

Testing indicated D.W. was at a 2.3 grade equivalent in math, and would benefit from a number of accommodations, including small group instruction.  (Tr. 386-388.)  With regard to D.W.'s reading comprehension, the IEP states as follows:

> On her reevaluation (11/4/2014), [D.W.]'s ability to display understanding of what she has read is also in the Low range as measured by the Passage Comprehension subtest.  She was able to read the passages but had a difficult time remembering what she read and would often reread for clarification.  In the classroom, [D.W.] requires prompting to get and then stay on task.  Her Language Arts teacher reports that [D.W.] is very polite and shows much effort

> in her work. She earned a 62% in Language Arts for the first quarter (in light of her Mastery accommodations). [D.W.] is reading at a second grade-fifth month reading level according to STARS testing. This is the level I also observe in my classroom. [D.W.] also struggles with the acquisition of new vocabulary, she regularly scores between a 20 and 50 percent on her weekly vocabulary tests. For the most part, she is consistent about returning her homework. When [D.W.] is focused, she works well in groups and contributes to the group's success.

(Tr. 389.) It was determined D.W. would continue to benefit from small group instruction, small group testing, all allowable portions of test read orally, frequent breaks, and extended time. (Tr. 389, 391-392, 395.)

In Case Conference Meeting Summary dated November 4, 2014, D.W.'s IEP team noted her "cognitive ability falls in borderline range." (Tr. 382.) It was also noted her "math calculation and applied problems in very low range, reading fluency and comprehension in low range (basic reading is average), writing in average range." (*Id.*) D.W.'s general education teacher, Mrs. Sherman, reported D.W. "works very hard but struggles greatly." (*Id.*)

In May 2015, the principal of D.W.'s Middle School sent a letter to Williams, indicating D.W. was failing Language Arts and would not be promoted to the Seventh Grade unless she completed summer school. (Tr. 244.) It appears, however, D.W. was able to pass Language Arts. (Tr. 239.) Her Sixth Grade Report Card shows she received the following fourth semester grades: (1) a D in Language Arts; (2) a C in Math; (3) a D in Ohio Achievement Prep; (4) a D in Science; and (5) a B in Social Studies. (*Id.*)

### State Agency Opinions

On October 4, 2013, D.W. underwent a consultative examination with state agency psychologist J. Joseph Konieczny, Ph.D. (Tr. 342-346.) In the background section of his report, Dr. Konieczny noted D.W. had never been diagnosed with ADHD. (Tr. 343.) He also stated

D.W. obtained average grades during fourth grade, had not been involved in any "disciplinary difficulties," and had never repeated any grades. (*Id*.) On examination, Dr. Konieczny stated D.W. "related very pleasantly and easily to the examiner" and "was cooperative in manner and responded readily to all questions and tasks posed to her." (Tr. 344.) He found "[h]er ability to concentrate and attend to tasks showed no indications of impairment." (*Id*.)

As part of the evaluation, Dr. Konieczny administered the Wechsler Intelligence Scale for Children-IV. (Tr. 344.) D.W. had a full scale IQ of 60. (*Id*.) She also had a verbal comprehension of 61, perceptual reasoning of 63, working memory of 62, and processing speed of 85. (*Id*.) Dr. Konieczny found that D.W.'s "full scale IQ places her in the extremely low range of intellectual functioning for individuals her age." (*Id*.) He further explained as follows:

> Based upon the available background information, as well as the information gathered during the testing and interview session, it is my opinion, with reasonable scientific certainty, that [D.W.] suffers from a diagnosis of Borderline Intellectual Functioning. Although results of intellectual testing place her capabilities in a range that could suggest a diagnosis of Mild Mental Retardation, her capabilities in some areas of intellectual functioning, as well as her apparent level of adaptive functioning would appear to extend beyond that which would be considered typical for an individual suffering from a diagnosis of Mild Mental Retardation. As such, a diagnosis of Borderline Intellectual Functioning would seem more appropriate. She also suffers from a diagnosis of Learning Disorder, Not Otherwise Specified. No further diagnosis is offered.

(*Id*.)

Dr. Koniezcny went on to evaluate D.W.'s functioning in four of the six domains. (Tr. 345.) He determined D.W. "would show some moderate deficits" in the area of acquiring and using information, but had "no significant limitation" in her ability to attend and complete tasks. (*Id*.) Dr. Koniezcny further found D.W. would have "some difficulties" in her ability to interact with and relate to others, and "some limitations . . . and some diminished coping skills" in the

area of self-care. (*Id.*)

In October 2013, state agency psychologist Bruce Goldsmith, Ph.D., and state agency pediatrician Bruce Mirvis, M.D., reviewed D.W.'s records and completed a Childhood Disability Evaluation. (Tr. 68-70.) Dr. Goldsmith determined D.W. had marked limitations in the domain of Acquiring and Using Information, based on her Full Scale IQ score of 60. (Tr. 69.) He further determined D.W. had a "less than marked" limitation in the domain of Attending and Completing Tasks, and no limitation in the domain of Interacting and Relating with Others. (*Id.*) Dr. Mirvis determined D.W. had no limitations in the domains of moving about and manipulating objects, caring for herself, and health and physical well-being. (Tr. 69-70.) These physicians explained D.W. "does not functionally equal listing– The child's medically determinable impairment or combination of impairments is severe, but does not meet, medically equal, or functionally equal the listings." (Tr. 70.)

In January and February 2014, state agency psychologist Patricia Semmelman, Ph.D., and pediatrician Robert Klinger, M.D., reviewed D.W.'s records and completed a Childhood Disability Evaluation. (Tr. 81-82.) Dr. Semmelman determined D.W. had a "less than marked" limitation in the domain of Acquiring and Using Information. (Tr. 81.) She noted D.W.'s Full Scale IQ scores of 60 and 69, but explained as follows:

> The school psychologist opined this was an underestimate due to problems with concentration and attention and not being fully cooperative. Reading 98 comp 83 math 80. Given the school mer, the claimant does not appear to have put forth her best effort on the current testing.

(*Id.*) Dr. Semmelman also determined D.W. had a "less than marked" limitation in the domain of Attending and Completing Tasks, explaining as follows:

> She was cooperative in manner. Her ability to concentrate and attend to tasks

15

showed no indications of impairment.

Teacher notes very serious problems focusing, carrying out multi-step instructions and completing work at a reasonable pace.

Peds in 4-13 did not show any issues in this area when seen. Claimant's mother does not want her to have [prescription] for ADHD until this is for sure.

(Tr. 81-82.) Finally, Dr. Semmelman concluded D.W. had no limitation in the domain of interacting and relating with others. (Tr. 82.) Dr. Klinger concluded D.W. had no limitations in the domains of moving about and manipulating objects, caring for herself, and health and physical well-being. (*Id.*)

### *Hearing Testimony*

During the hearing, Williams testified as follows:

- D.W. has problems understanding and staying on task. (Tr. 45.) She is easily distracted and requires a lot of instruction. (*Id.*) D.W.'s limitations have required her (Williams) to spend a lot of extra time and attention with D.W. with regard to her school work. (Tr. 43.)

- D.W. is a "very pleasant," friendly person. (Tr. 46.) She does not exhibit bad behavior and has not had any disciplinary problems at school. (Tr. 46, 54.) She is just "developmentally delayed" and has difficulty processing information. (Tr. 46-47.)

- D.W.'s school psychologist diagnosed her with ADHD. (Tr. 47.) Her neurologist, Dr. Gupta, primarily treated D.W. for epilepsy and has not diagnosed her with ADHD. (Tr. 48.) D.W. has never taken medication for ADHD because Williams "didn't believe that the medication would help what she's going through." (Tr. 46.) It was never explained to Williams that medication might address D.W.'s ADHD symptoms. (Tr. 47-50.)

- Applewood Centers evaluated D.W. at school. (Tr. 52.) This evaluation led to D.W.'s Individualized Education Plan ("IEP"). (*Id.*) D.W. has accommodations at school, including speech classes, small group instruction, and testing accommodations. (Tr. 53.) D.W. can read on her own but has trouble processing what she reads. (*Id.*) She has an IEP for the 2015-2016 school year. (Tr. 54.)

- D.W. has never been held back in school. (Tr. 52-53.) She was a candidate for

16

summer school in language arts, but D.W.'s last project allowed her to pass that class with a D.  (*Id.*)

• D.W. has chores at home, including cleaning her room, washing the dishes, and light laundry.  (Tr. 53.)  She is able to complete her chores with instruction and reminders.  (Tr. 53-54.)  D.W. takes care of her own hygiene with instructions.  (Tr. 54-55.)

• D.W. has two brothers and a sister.  (Tr. 54.)  She gets along with her siblings, and with people in general.  (*Id.*)

The ALJ also asked D.W. questions during the hearing.  D.W. testified as follows:

• She is 12 years old and will be entering the 7th grade.  (Tr. 56.)

• She has siblings.  (Tr. 56.)  She plays the most with her nine year old brother.  (*Id.*)  She also helps him with his homework, especially his math homework.  (Tr. 57.)  She considers math to be her best subject.  (*Id.*)

### III.  Standard for Disability

To qualify for SSI benefits, an individual must demonstrate a disability as defined under the Act.  "An individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S .C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process.  20 C.F.R. § 416.924(a).  At step one, a child must not be engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  At step two, a child must suffer from a "severe impairment."  20 C.F.R. § 416.924(c).  At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the listings, the Commissioner will assess the functional limitations caused by the impairment. 20 C.F.R. § 416.926a(a). The Commissioner will consider how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [ ]self; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled. 20 C.F.R. § 416.926a(d). To receive SSI benefits, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

A "marked" limitation is one which seriously interferes with functioning. 20 C.F.R. § 416.926a(e)(2)(i). "Marked" limitation means "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.*

An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation means "more than marked." 20 C.F.R. § 416.926a(e)(3)(I). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id.*

If an impairment is found to meet, or qualify as the medical or functional equivalent of a listed disability and the twelve-month durational requirement is satisfied, the claimant will be

deemed disabled.  20 C.F.R. § 416.924(d)(1).

## IV.  Summary of Commissioner's Decision

The ALJ made the following findings regarding D.W. in the August 6, 2015 decision:

1. The claimant was born on March *** 2003.  Therefore, she was a school-age child on March 18, 2013, the date application was filed, and is currently an adolescent (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since March 18, 2013, the application date (20 CFR 416.924(b) and 416.971 *et seq*.)

3. The claimant has the following severe impairments: learning disorder and borderline intellectual functioning (20 CFR 416.924(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925, and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6. The claimant has not been disabled, as defined in the Social Security Act, since March 18, 2013, the date the application was filed (20 CFR 416.924a).

(Tr. 14-29.)  The ALJ found D.W. had less than marked limitations in the following two domains: acquiring and using information and attending and completing tasks.  (Tr. 22-25.)  She further found D.W. had no limitations in the remaining domains of interacting and relating with others; moving about and manipulating objects; caring for oneself; and, health and physical well-being.  (Tr. 25-29.)

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec*., 348 F.3d 124, 125 (6th Cir.2003) ("decision must be affirmed

if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.1983). Substantial evidence has been defined as " 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir.2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772–3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir.1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov.1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov.15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

### *Functional Equivalence*

Williams argues the ALJ erred in finding D.W.'s impairments were not functionally equivalent to a listing at step three of the sequential evaluation. Specifically, she maintains substantial evidence does not support the ALJ's conclusion that D.W. had "less than marked" limitations in the domains of Acquiring and Using Information and Attending and Completing Tasks. (Doc. No. 12.) The Commissioner argues substantial evidence supports the ALJ's determination that D.W.'s mental impairments did not functionally equal the Listings. (Doc. No. 14.)

To functionally equal the listings, an impairment(s) must be of listing-level severity; i.e. it must result in "marked" limitations in two domains of functioning or an "extreme" limitation

in one domain.  *See* 20 C.F.R. § 416.926a(a); Social Security Ruling ("SSR") 09–1p (March 19,

2009).  In determining whether a child has a "marked" or "extreme" limitation, the Agency will:

> ... consider your functional limitations resulting from all of your impairments,
> including their interactive and cumulative effects. We will consider all the
> relevant information in your case record that helps us determine your functioning,
> including your signs, symptoms, and laboratory findings, the descriptions we have
> about your functioning from your parents, teachers, and other people who know
> you, and the relevant factors explained in §§ 416.924a, 416 .924b, and 416.929.

20 C.F.R. § 926a(e).  The factors set forth in §§ 416.924a, 416.924b, and 416.929 include, but

are not limited to the following: how well a child can initiate and sustain activities; how much

extra help a child needs; the effects of structured or support settings; how a child functions in

school; and, the effects of medications or other treatment.  *See* 20 C.F.R. § 416.926a(a).  In

determining whether a child functionally equals a listing, ALJs need not discuss all of the

considerations set forth in 20 C.F.R. § 926a and SSR 09–1p; however, they must "provide

sufficient detail so that any subsequent reviewers can understand how they made their findings."

SSR 09–1p.[4]

### *Acquiring and Using Information*

The domain of acquiring and using information considers "how well [the child]

acquire[s] or learn[s] information, and how well [the child] use[s] the information [he/she] has

---

[4] In assessing functional equivalence, the Agency employs a "whole child" approach.
Under this approach, "[w]e focus first on the child's activities, and evaluate how appropriately,
effectively, and independently the child functions compared to children of the same age who do
not have impairments.  20 CFR 416.926a(b) and (c). We consider what activities the child cannot
do, has difficulty doing, needs help doing, or is restricted from doing because of the
impairments. 20 CFR 416.926a(a).  Activities are everything a child does at home, at school, and
in the community, 24 hours a day, 7 days a week."  SSR 09–2p.  The Agency next evaluates the
effects of a child's impairments by rating the degree to which the impairment(s) limits
functioning in the six domains. SSR 09–2p.

learned." 20 C.F.R § 416.926a(g).  With regard to school age children such as D.W., the Agency

considers a child's functioning in this domain in the following context:

> When you are old enough to go to elementary and middle school, you should be
> able to learn to read, write, and do math, and discuss history and science. You
> will need to use these skills in academic situations to demonstrate what you have
> learned; e.g., by reading about various subjects and producing oral and written
> projects, solving mathematical problems, taking achievement tests, doing group
> work, and entering into class discussions. You will also need to use these skills in
> daily living situations at home and in the community (e.g., reading street signs,
> telling time, and making change). You should be able to use increasingly complex
> language (vocabulary and grammar) to share information and ideas with
> individuals or groups, by asking questions and expressing your own ideas, and by
> understanding and responding to the opinions of others.

20 C.F.R § 416.926a(g)(iv).  Examples of limitations in this domain include, but are not limited

to: inability to demonstrate understanding of words about space, size or time; inability to rhyme

words or the sounds in words; difficulty recalling important things learned in school yesterday;

difficulty solving mathematics questions or computing arithmetic answer; talking only in short,

simple sentences and difficulty explaining what you mean.[5]  *See* 20 C.F.R § 416.926a(g)(i)-(v).

Here, the ALJ concluded, at step two, that D.W. suffered from the severe impairments of

learning disorder and borderline intellectual functioning.  (Tr. 17.)  After determining D.W. did

---

[5] As the ALJ noted, D.W. changed age categories to an "adolescent" by the time of the hearing.  (Tr. 17.)  The regulations consider an adolescent child's functioning in this domain, as follows: "In middle and high school, you should continue to demonstrate what you have learned in academic assignments (e.g., composition, classroom discussion, and laboratory experiments). You should also be able to use what you have learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation). You should be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas). You should also learn to apply these skills in practical ways that will help you enter the workplace after you finish school (e.g., carrying out instructions, preparing a job application, or being interviewed by a potential employer)."  20 C.F.R. § 416.926a(g)(v).

not meet or medically equal Listings 112.02 for organic mental disorders or 112.05 for intellectual disability, the ALJ determined D.W.'s mental impairments did not functionally equal the severity of the Listings.  (Tr. 18-29.)  Specifically, the ALJ explained as follows:

> Although the claimant's learning disability and borderline intellectual functioning could reasonably be expected to produce some functional limitations, the level of the claimant's alleged intellectual and learning difficulties is not fully supported by the record.  While the claimant receives special education services in school, she has never failed a grade.  (Hearing testimony; Exhibits 1E; 5E, p.2; 7E, p. 10, 14-15; 8E, p. 9, 11-15).  Upon examination, Dr. Gupta also noted the claimant displayed appropriate behavior and interaction for her age and only had a 'modest' developmental delay in speech and language (Exhibit 2F, p.2).  In fact, the claimant's mother reported to consultative examiner Dr. Konieczny the claimant earned average grades (Exhibit 6F, p. 3; *see also* Exhibit 8E, p. 17.)  Although intelligence testing performed using the Wechsler Intelligence Scale for Children (WISC-IV) revealed the claimant has a full scale IQ of 60, Dr. Konieczny noted her capabilities in some areas of intellectual functioning, presentation, and apparent level of adaptive functioning instead warranted diagnoses of borderline intellectual functioning and learning disorder (Exhibit 6F, p. 4; see also Exhibit 1F, p. 9).  The claimant previously obtained a higher IQ score of 69, but Matthew Park, M.S., noted the claimant appeared to give minimal effort and concluded this score was not the best estimate of her overall intelligence (Exhibit 1F, p. 9).  This suggests the claimant is able to function at a higher level than suggested by her IQ scores.

> At the hearing, the claimant's mother testified the claimant was capable of performing tasks that suggest her level of functioning is not as limited as alleged.  For instance, the claimant's mother testified the claimant has multiple chores.  She is able to keep her room clean, wash dishes, and do laundry.  The claimant also testified she is able to help her brother with his mathematics homework.  All of these tasks require at least some ability to learn and function intellectually.

(Tr. 20-21.)

With regard to the specific domain of acquiring and using information, the ALJ found as follows:

**The claimant has less than marked limitation in acquiring and using information**.

The claimant's mother contended the claimant's learning disability and borderline

intellectual functioning decreased her level of functioning in this domain (Hearing testimony; Exhibit 4E, p. 2). The claimant's teacher also reported the claimant has significant problems in this domain (Exhibits 7E, p. 3; 8E, p. 2). Although the record revealed she receives some special education services at school, she has never been held back a grade (Exhibits 1F, p. 9; 6F, p. 4; 10F). As mentioned above, intelligence tests indicating the claimant had a low IQ were deemed to be inaccurate descriptions of her intellectual functioning. In fact, the claimant's report cards establish she has passed all of her classes and has even earned As and Bs in some classes like mathematics and writing (Exhibit 8E, p. 17; see also Exhibit 6F, p.3). Her educational records also state she follows a grade-level curriculum in the resource room (Exhibit 10F, p. 5). Educational records also indicate the claimant's ability to learn is improved with repetition, applying concepts to real life situations, breaking concepts down into smaller parts, and visual support (*Id.*) The claimant's mother also states the claimant is able to read and perform mathematical calculations (Exhibit 2E, p. 7). Furthermore, the claimant testified she is able to teacher her younger brother math concepts, which suggests the claimant is able to acquire and use information.

(Tr. 23.)

Substantial evidence supports the ALJ's conclusion that D.W. had a less than marked limitation in acquiring and using information. As the ALJ notes, although intelligence testing showed D.W. had full scale IQ scores of 69 and 60, the physicians who administered these tests determined the scores were not reflective of D.W.'s overall cognitive functioning. Specifically, in 2011, school psychologist Mr. Parks found D.W.'s full scale IQ of 69 was not "the best estimate of her overall intelligence," and placed more weight on the results of other testing that showed D.W.'s cognitive abilities were in the low average range when compared to peers her age. (Tr. 253.) Similarly, in 2013, Dr. Konieczny diagnosed Learning Disorder and Borderline Intellectual Functioning ("BIF") despite D.W.'s full scale IQ of 60, noting "[a]lthough results of intellectual testing place her capabilities in a range that could suggest a diagnosis of Mild Mental Retardation, her capabilities in some areas of intellectual functioning, as well as her apparent level of adaptive functioning would appear to extend beyond that which would be considered

typical for an individual suffering from a diagnosis of Mild Mental Retardation." (Tr. 344.) In the decision, the ALJ acknowledged both Mr. Parks' and Dr. Konieczny's findings regarding the validity of D.W.'s IQ scores, and stated "this suggests the claimant is able to function at a higher level than suggested by her IQ scores." (Tr. 20.) *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 126 (6th Cir. 2003) (upholding decision that claimant did not meet, medically equal or functionally equal a Listing where ALJ credited physician opinion that claimant was operating in the borderline range of intelligent functioning despite the fact that her intelligence test scores, standing alone, would indicate mental retardation).

D.W.'s educational records also support the ALJ's finding that D.W. had a less than marked limitation in this domain. In 2011, D.W.'s IEP team found that "[o]n academic assessments most skills were measured to be in the average to low average range." (Tr. 267.) In May 2013, D.W.'s IEP noted that "looking over her recent performance [in Language Arts] (including her ETR) and observations, [D.W.] has made progress in these areas" and "will no longer have a goal for reading comprehension, reading fluency, and writing." (Tr. 287.) The IEP team determined that "starting on 8/21/2013, [D.W.] will receive Math and Language Arts instruction in the regular education classroom with pullout into the resource room." (Tr. 295.) D.W.'s Fourth Grade Report Card showed that (during the first, second, and third semesters) D.W. earned B's and a C in Reading; B's in Writing; and an A, B, and C in Math. (Tr. 178-179.)

Moreover, despite Williams' argument to the contrary, the ALJ correctly found D.W. passed all her classes and was never held back a grade. While Williams correctly notes D.W.'s Middle School indicated D.W. was failing Language Arts and would not be promoted to the next grade unless she attended summer school, the record indicates D.W. was able to raise her grade

and graduate from the Sixth Grade. (Tr. 239.) In addition, Williams testified at the hearing that D.W. had never been held back at school (Tr. 52-53) and, further, informed Dr. Konieczny that D.W. obtained "average grades" and had never repeated a grade. (Tr. 343.) Williams also indicated D.W. was able (with instructions and reminders) to complete chores, such as cleaning her room, washing dishes, and light laundry. (Tr. 155, 171.)

Furthermore, in evaluating D.W.'s functional limitations, the ALJ accorded great weight to the assessments of state agency physicians Dr. Semmelman and Dr. Konieczny. Dr. Semmelman concluded D.W. had a "less than marked limitation" in Acquiring and Using Information, finding D.W.'s full scale IQ scores were an underestimate of her intellectual functioning. (Tr. 81.) As discussed above, Dr. Konieczny also found D.W.'s intellectual functioning was greater than suggested by her low IQ score. (Tr. 344.) He further concluded D.W. would "show moderate deficits" in the domain of Acquiring and Using Information. (Tr. 345.) These medical opinions provide substantial evidence in support of the ALJ's finding that D.W. has a "less than marked" limitation in this domain.

Williams argues, summarily, that "Dr. Konieczny's assessment of D.W.'s intellectual capabilities is more restrictive than what the ALJ determined." (Doc. No. 12 at 11.) This argument is without merit. As an initial matter, Williams does not articulate how Dr. Konieczny's assessment that D.W. had "moderate deficits" in Acquiring and Using Information is more restrictive than the ALJ's finding that she had a "less than marked" limitation in that domain. Williams cite no legal authority for the proposition that a "moderate deficit" necessarily equates to a "marked" limitation and, in fact, the regulations indicate the opposite. As noted above, a "marked" limitation means "more than moderate" but "less than extreme." 20 C.F.R §

416.926a(e)(2)(i).  Thus, the Court rejects Williams' argument that Dr. Konieczny's opinion does not support the ALJ's conclusion with respect to this domain.[6]

Williams also argues the ALJ failed to adequately consider Mrs. Davis' teacher questionnaires indicating (1) D.W.'s functioning was "below average" in a number of areas, including her ability to progress in learning the skills involved in reading, writing, and mathematics; and (2) D.W. had "serious problems" in several aspects of the domain of Acquiring and Using Information.  (Tr. 167-168, 182.)  Williams also asserts the ALJ failed to address a November 2014 case conference meeting note, indicating D.W.'s cognitive ability fell into the "borderline range" with math calculation and problem solving in the "very low" range.  (Tr. 382.)

The regulations emphasize that "[n]o single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain." 20 C.F.R. § 416.926a(e)(4)(I).  In this case, the ALJ made it clear that she considered D.W.'s educational records.  (Tr. 20-23.)  She acknowledged D.W. received special education services and various accommodations at school, but found the record as a whole showed D.W. received average grades, had never been held back, and her ability to learn was improved with extra instruction

---

[6] Williams also notes, in passing, that Dr. Gupta opined D.W. was "markedly limited" in the domain of Acquiring and Using Information.  (Tr. 324-327.)  The ALJ accorded only "some weight" to this opinion on the grounds that Dr. Gupta "only provided checkmarks on a pre-printed form and did not provide any explanation or reference to office notes for support.  Where she did provide an explanation, it was minimal and related to side effects of medication, school attendance, and school accommodations."  (Tr. 21.)  Williams does not argue the ALJ failed to provide "good reasons" for rejecting Dr. Gupta's opinion.  Even if the Court were to reach the issue, it would find the ALJ properly discounted Dr. Gupta's opinion that D.W. was markedly limited in this domain.  The ALJ correctly notes Dr. Gupta provided no explanation or support for her opinion.  Moreover, it is worth noting that contemporaneous treatment notes from Dr. Gupta indicate D.W. has only "modest developmental delays."  (Tr. 321.)

and support.  (Tr. 23.)  Moreover, even if Ms. Davis' report supported the conclusion that D.W. was markedly limited in this area, remand would not be appropriate as the ALJ's conclusion is supported by substantial evidence.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) ("If the Commissioner's decision is based upon substantial evidence, we must affirm, even if substantial evidence exists in the record supporting a different conclusion.").  Indeed, "the evaluation of whether substantial evidence exists does not involve deciding whether this Court would have reached a different decision based upon any singular piece of evidence."  *Smith v. Comm'r of Soc. Sec.*, 2015 WL 9467684 at * 7 (S.D. Ohio Dec. 2, 2015) *report and recommendation adopted*, 2015 WL 9460280 (S.D. Ohio Dec. 28, 2015).  In view of all the other countervailing evidence, the Court finds there is substantial evidence in the record to support the ALJ's conclusion that D.W. was not markedly impaired in Acquiring and Using information.

As another district court within this Circuit has explained, "many children with 'less than marked' limitations may perform poorly in school and/or require significant additional resources for a variety of reasons that do not equate to a 'disability.'"  *Darks v. Comm'r of Soc. Sec.*, 2016 WL 703581 at * 5 (S.D. Ohio Jan. 25, 2016), *report and recommendation adopted*, 2016 WL 695992 (S.D. Feb. 22, 2016).  *See also Smith*, 2015 WL 9467684 at * 9.  Indeed, it bears repeating that:

> The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  The Commissioner's decision must be affirmed so long as "such relevant evidence [exists] as a reasonable mind might accept as adequate to support" it.  *Cutlip v. Sec'y of Health and Human Svcs.*, 25 F.3d 284, 286 (6th Cir.

1994).

Accordingly, and for all the reasons set forth above, the ALJ's determination that D.W. had a "less than marked" limitation in the domain of Acquiring and Using Information is supported by substantial evidence. Williams' argument to the contrary is without merit.

### Attending and Completing Tasks

The domain of attending and completing tasks considers "how well [the child is] able to focus and maintain [her] attention, and how well [she] begin [s], carr[ies] through, and finish[es][her] activities, including the pace at which [she] perform[s] activities and the ease with which [she] change[s] them." 20 C.F.R. § 416.926a(h). With regard to school age children such as D.W., the Agency considers a child's functioning in this domain in the following context:

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodations.

20 C.F.R. § 416.926a(h)(2)(iv).[7] Examples of limitations in this domain include, but are not

---

[7] The regulations consider an adolescent child's functioning in this domain, as follows: "In your later years of school, you should be able to pay attention to increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long-range academic projects. You should also be able to organize your materials and to plan your time in order to complete school tasks and assignments. In anticipation of entering the workplace, you should be able to maintain your attention on a task for extended periods of time, and not be unduly distracted by your peers or unduly distracting to them in a school or work setting." 20 C.F.R. § 416.926a(h)(v).

limited to: being easily startled, distracted or over-reactive to sounds, sights, movements or touches; being slow to focus on, or fail to complete activities of interest; becoming repeatedly sidetracked from activities or frequently interrupting others; being easily frustrated and giving up on tasks; and, requiring extra supervision to remain engaged in an activity. *See* 20 C.F.R. § 416.926a(h)(3)(i)-(v). These examples do not describe a specific degree of limitation in this domain. 20 C.F.R. § 416.926a(h)(3).

Here, at step two, the ALJ concluded D.W.'s ADHD did not constitute a medically determinable impairment due to "a lack of objective evidence."[8] (Tr. 18.) The ALJ explained as follows:

> A medically determinable impairment may not be established solely on the basis of symptoms alone, or on the claimant's allegations regarding symptomatology (20 CFR 416.908, and SSR 96-4p). Although the claimant's school psychologist and a social worker at Applewood Centers have stated the claimant has ADHD, she has never been diagnosed with ADHD by an acceptable medical source (20 CFR 416.927(a)(2); SSR 06-03p). Dr. Gupta also noted that the claimant's school psychologist stated the claimant could potentially have ADHD but refrained from diagnosing the claimant with ADHD himself (Exhibit 2F, p. 2). The claimant's mother also admitted on at least two occasions that a physician had never diagnosed the claimant with ADHD (Hearing testimony; Exhibit 6F, p. 3). Consultative examiner Joseph Konieczny also explicitly stated the claimant did not have ADHD and did not display limitations in maintaining concentration (Exhibit 6F, p. 3-4). Furthermore, the claimant's mother refused to allow the claimant to take ADHD medication unless "it is for sure" and admitted she did not take any steps to consult a professional who could tell her if the claimant did actually have ADHD (Hearing testimony; Exhibit 2F, p. 2).

(Tr. 18.) With regard to the domain of Attending and Completing Tasks, the ALJ found as follows:

**<u>The claimant has less than marked limitation in attending and completing tasks.</u>**

---

[8] Williams does not challenge this step two finding in the instant case.

As mentioned above, the claimant's mother alleged the claimant had ADHD, as well as difficulties maintaining concentration and staying on task (Hearing testimony; Exhibits 2E, p. 11; 6E, p. 3; 2F, p. 2). The claimant's teacher also stated the claimant had some problems with attention, concentration, following directions, and working independently (Exhibits 5E, p. 2; 7E, p. 4; 8E, p. 3; see also Exhibit 16E, p. 2). However, as mentioned above, the claimant has never been diagnosed with ADHD by an acceptable medical source. Dr. Konieczny also concluded the claimant's ability to concentrate and attend to tasks were not impaired (Exhibit 6F, p. 4). Additionally, the claimant has never been disciplined at school for not paying attention or completing tasks (Exhibit 6F, p. 4).

Moreover, a review of the record indicated the claimant is capable of performing numerous tasks that require at least some ability to attend to and complete tasks. For instance, the claimant's mother and her teacher reported the claimant has no problems carrying out single-step instructions (Exhibits 6E, p.3; 7E, p. 4; 8E, p. 3). The claimant's mother further explained that the claimant worked on arts and crafts projects and completed her chores (Hearing testimony, Exhibit 2E, p. 11). Educations records also mentioned the claimant liked to play video and board games (Exhibits 1F, p. 42; 10F, p. 4). The claimant also testified she is able to teach her younger brother how to do homework, especially math homework.

(Tr. 24-25.)

Substantial evidence supports the ALJ's conclusion that D.W. had a less than marked limitation in attending and completing tasks. State agency physicians Drs. Konieczny, Dr. Goldsmith and Dr. Semmelman each concluded D.W. had "less than marked" limitations in Attending and Completing Tasks. (Tr. 69, 81-82, 345.) Indeed, during his consultative examination, Dr. Konieczny found D.W.'s "ability to concentrate and attend to tasks showed no indications of impairment." (Tr. 344.) The ALJ accorded great weight to these opinions, finding they were consistent with the record as a whole. (Tr. 21.) Accordingly, and in the absence of any meaningful argument to the contrary, the Court finds the opinions of Drs. Konieczny, Dr. Goldsmith and Dr. Semmelman provide substantial evidence in support of the ALJ's finding that D.W. has a "less than marked" limitation in Attending and Completing Tasks.

In the decision, the ALJ also noted D.W. (1) had never been disciplined at school for not

paying attention; and (2) was capable of performing numerous tasks that required "at least some ability to attend to and complete tasks," including carrying out single-step instructions, working on arts and crafts projects, completing chores, playing video and board games, and helping her brother with his math homework. (Tr. 24-25.) These findings are supported by substantial evidence. Williams testified at the hearing that D.W. did not have any disciplinary problems at school and, further, advised Dr. Konieczny that D.W. "has not been involved in any disciplinary difficulties." (Tr. 54, 343.) The May 2013 IEP noted D.W. was "a very friendly student and likes to do well in her classwork." (Tr. 286.) This IEP also noted that, while D.W. "at times is off-task and a distraction, . . .with prompting she is easily able to regain focus." (Tr. 287.) Moreover, D.W.'s Fourth Grade Report Card indicates that, by the third semester, D.W.'s work habits were all graded as "superior," including in the following areas: (1) completing class work on time, (2) completing work accurately and neatly, (3) working independently, (4) working and interacting well with others, (5) being attentive and following directions; and (6) displaying organizational skills. (Tr. 179.)

The ALJ also correctly relies on record evidence indicating D.W. was capable of carrying out simple instructions, completing chores, and working on arts and crafts projects. In May 2013, D.W.'s teacher, Ms. Davis, indicated D.W. had only a "slight problem" in working without distracting herself or others, and "no problem" in carrying out single-step instructions and organizing her own things or school materials. (Tr. 183.) Williams indicated in a Function Report that D.W. was able to work on arts and crafts projects and "complete chores most of the time." (Tr. 155.) Moreover, the November 2014 IEP states D.W. enjoys playing video and board games. (Tr. 385.) The ALJ did not err in relying on this evidence to find D.W. has a "less

than marked" limitation in Attending and Completing Tasks. *See e.g., Zeiger v. Colvin*, 2014 WL 4421395 at * 4, 9-10 (N.D. Ohio Sept. 8, 2014) (affirming denial of benefits where ALJ relied on consultative examiner opinion that found less than marked limitations in attending and completing tasks based, in part, on child's ability to perform household chores and play video games); *Walker o/b/a S.A.M. v. Comm'r of Soc. Sec.*, 2014 WL 4074372 at * 8 (S.D. Ohio Aug. 14, 2014) (finding child's "ability to concentrate on television and video games for such an extended period of time supports the ALJ's conclusion that [the child] does not have a 'marked' limitation in attending and completing tasks"); *Cartwright v. Comm'r of Soc. Sec.*, 2011 WL 4962493, at *9–40 (E.D. Mich. Aug.23, 2011), *report and recommendation adopted*, 2011 WL 4962413 (E.D. Mich. Oct.19, 2011) (evidence that child played video games and read for 3 to 4 hours daily supported ALJ's finding of a "less than marked" limitation in the attending and completing tasks domain).

Williams argues remand is required because "the entirety of the ALJ's analysis rests solely on the issue of whether or not D.W. was formally diagnosed with ADHD," leading the ALJ to ignore other evidence of her marked limitations in this domain. The Court disagrees. As noted above, the ALJ acknowledged evidence from D.W.'s teachers and mother that D.W. had significant difficulty with attention, concentration, following directions, and working independently. (Tr. 24.) However, the ALJ also discussed evidence that D.W. was capable of performing a variety of tasks that required the ability to attend to and complete tasks. Moreover, the ALJ relied on the opinions of Drs. Konieczny, Dr. Goldsmith and Dr. Semmelman, each of whom concluded D.W. had "less than marked" limitations in Attending and Completing Tasks. (Tr. 69, 81-82, 345.)

Accordingly, and for all the reasons set forth above, the ALJ's determination that D.W. had a "less than marked" limitation in the domain of Attending and Completing Tasks is supported by substantial evidence. Williams' argument to the contrary is without merit.

## VII. Conclusion

For the foregoing reasons, the Court finds the decision of the Commissioner is supported by substantial evidence. Accordingly, it is recommended the decision of the Commissioner be AFFIRMED.

Date: April 12, 2017                                          *s/ Jonathan D. Greenberg*
                                                             Jonathan D. Greenberg
                                                             U.S. Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**